**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

INFINITY TRANSPORTATION III
LLC,

                **Plaintiff,**

      **v.**                                                    **1:17-cv-1123-WSD**

XPO INTERMODAL, INC.,

                **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant XPO Intermodal, Inc.'s

("XPO") Partial Motion to Dismiss Plaintiff's First Amended Complaint [13] (the

"Motion to Dismiss").

## I.    BACKGROUND

    A.    <u>Introduction</u>[1]

This dispute arises from alleged misrepresentations and confidentiality

breaches in connection with the purchase and sale of 340 railcars (the "Railcars")

for approximately $22 million.  Plaintiff Infinity Transportation III LLC

---

[1]    These facts are take from Infinity's First Amended Complaint [10] (the
"Amended Complaint," or "Compl.") and accepted as true for purposes of this
Motion.

("Infinity") purchased the Railcars pursuant to a purchase and sale agreement effective May 29, 2015 (the "Purchase Agreement"). (Compl. Ex. 2). At the time of sale, the Railcars were included in a pool of other railcars available for lease to national railroad companies (the "Pool"). Infinity alleges there were preexisting commercial relationships between XPO and major railroads that XPO represented did not exist. These preexisting relationships impacted the inclusion of the Railcars in the Pool, thus impacting the value of the Railcars to Infinity.

B.   Facts

Railcars are used by railroads to carry shipping containers throughout the United States. (Compl. ¶ 14). These railcars, owned by different owners, operate in a pool. The owner of the cars in the pool are paid by railway companies based on a "car hire" rate. This rate is calculated based on the amount of time the railcar is used and the distance traveled. (Id. ¶ 16). When a loaded railcar in the Pool reaches its destination, it is unloaded, and reloaded if a railroad customer wants to transport shipping containers to another location. If the railcar is not reloaded, it is redirected elsewhere until it is needed.[2] Even though empty, the railcar continues to earn "car hire" from the railroads on whose lines the car travels. (Id. ¶ 18).

_____

[2]   Empty cars in the Pool may also be directed to their "Home Road." A railcar's Home Road is the rail line on which an empty car may sit without

XPO is one of the nation's largest logistics and intermodal companies. (Id. ¶ 2). It owns or otherwise has an interest in a fleet of railcars that it operates in the Pool. The Railcars XPO sold to Infinity were in the Pool. (Id. ¶ 22).

On or about April 13, 2015, Infinity and XPO entered into a non-disclosure agreement (the "Nondisclosure Agreement") in connection with their discussions regarding the possibility of XPO selling railcars to Infinity. (Id. ¶ 28; Ex. 1). In the Nondisclosure Agreement the parties agreed not to disclose the fact of their discussions. (Id. Ex. 1.).

During their negotiations, Infinity asked XPO to expressly represent that the Railcars in the Pool were not subject to any special arrangement XPO had with any railroad. Infinity wanted to confirm that XPO had not entered into any side agreements or understandings that would adversely affect the Railcars' use in the Pool after XPO sold the Railcars to Infinity. (Id. ¶ 32).

On April 7, 2015, an Infinity executive, Paul Goss, sent an e-mail to Phil Harrison, XPO's agent for the sale, asking XPO to "[c]larify any formal or implied 'quid pro quo' agreements, if any, between [XPO] and any railroads or shippers

---

accruing any car hire rates. An empty car that is sent to its Home Road may sit idle—not earning any car hire for its owner—until it is once again needed to transport cargo. (Id. ¶ 19).

that bind use of this equipment to business activity originated by [XPO]." (Id. ¶ 34). Harrison expressly represented that he was unaware of any agreements and that there were no arrangements between XPO and any railroad that would impact the continued use of the Railcars in the Pool. (Id. ¶ 35).

After the diligence period, the parties entered into the Purchase Agreement in which Infinity purchased the Railcars for approximately $22 million. In the Purchase Agreement, XPO represented in paragraph 5.1(b):

> To XPO's knowledge, XPO's ownership of any of the Railcars is not a condition precedent (either formal or informal, contractual or noncontractual, oral or written) to any railroad's willingness to load, unload, move, or accept any of the Railcars for movement; provided, however, XPO makes no representations or warranties about the practices or preferences of any railroad, it being understood that in any event the Railcars operate subject to the AAR Code of Car Service Rules/Code of Car Hire Rules.

(Id. Ex. 2 ¶ 5.1(b)).

The Purchase Agreement also contains a confidentiality provision ("Confidentiality Provision") that requires the parties

> to keep confidential and not to disclose to any person or entity, other than its employees, attorneys, advisors and financiers, this Agreement and the contents hereof, including without limitation, the purchase price and other terms and conditions of this Agreement and the Transactions, except as may be required by applicable law, necessary for UMLER modifications, or permitted under the parties' Confidentiality Agreement dated April 13, 2015. The parties agree not to make any press release or public announcement with respect to this Agreement or the Transactions without the parties' mutual

consent or except as may be required by applicable law. XPO and
Buyer shall jointly prepare such notifications to third parties as may
be necessary or appropriate with respect to the Transactions
contemplated thereby.

(Id. Ex. 2, ¶ 23).

On June 1, 2015, Dan Heird, XPO's VP of Railcar Assets, sent an email to

Jean Chavez at Union Pacific railroad informing Union Pacific that the Railcars

had been sold to Infinity. (Id. ¶ 43; id. Ex. 3). Between June 1, 2015, and June 5,

2015, XPO also informed CSX railroad that XPO sold the Railcars to Infinity. (Id.

¶ 44). Shortly thereafter, Union Pacific rejected several Railcars. (Id. ¶ 46). CSX

also informed Infinity it would not accept the Railcars for reloading on its lines.

(Id.). Sometime later, Norfolk Southern railroad told Infinity that it would not

accept the Railcars on its line. (Id. ¶ 47). Infinity has not been able to reliably

circulate Railcars within the Pool, significantly diminishing their value to Infinity,

including by loss of income.

After railroads elected not to use the Railcars, Infinity claimed to have

learned, through discussions with XPO, that XPO had misrepresented the nature of

its prior arrangements with the railroads. (Id. ¶ 52). XPO admitted it had an

arrangement with Union Pacific that governed use of the Railcars when they were

owned by XPO. (Id. ¶ 53). Infinity claims Union Pacific agreed to act as a Home

Road for XPO's Railcars.  This arrangement affected Union Pacific's willingness to load, unload, move, and accept the Railcars for movement.  (<u>Id.</u> ¶ 54.)

B.  <u>Procedural History</u>

On March 28, 2017, Infinity filed this action against XPO [1].  On April 10, 2017, Infinity filed its Amended Complaint [10] alleging nine counts against XPO.  Count One alleges breach of the Purchase Agreement as a result of XPO's alleged representation that its ownership was not a condition precedent to any railroad's use of the Railcars.  (<u>Id.</u> ¶¶ 62-72).  Count Two alleges breach of the Purchase Agreement's Confidentiality Provision.  (<u>Id.</u> ¶¶ 73-79).  Count Three alleges breach of the duty of good faith and fair dealing in connection with the Purchase Agreement.  (<u>Id.</u> ¶¶ 80-87).  Count Four alleges breach of the Nondisclosure Agreement.  (<u>Id.</u> ¶¶ 88-94).  Count Five alleges breach of the duty of good faith and fair dealing in connection with the Nondisclosure Agreement. (<u>Id.</u> ¶¶ 95-102).  Count Six alleges fraud, fraudulent inducement, and fraudulent concealment based on XPO's alleged false representations and XPO's representations made to Paul Goss.  (<u>Id.</u> ¶¶ 102-116).  Count Seven alleges negligent misrepresentation.  (<u>Id.</u> ¶¶ 117-127).  Count Eight alleges violations of the Georgia Uniform Deceptive Trade Practices Act ("GUDTPA").  (<u>Id.</u> ¶¶ 128-136).  Count Nine claims litigation expenses.  (<u>Id.</u> ¶ 137-142).

On May 8, 2017, XPO moved to dismiss the Amended Complaint for Failure to State a Claim. ([13]).[3] The only substantive count not challenged in the motion is Count One, alleging breach of contract for violation of the provision of the Purchase Agreement concerning the representation about XPO's commercial relationships with railroads.

## II.    DISCUSSION

### A.    Legal Standard

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences." Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010). Although reasonable inferences are made in the plaintiff's favor, "'unwarranted deductions of fact' are not admitted as true." Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting S. Fla. Water Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (11th Cir. 1996)). Similarly, the Court is not required to accept conclusory allegations and legal conclusions as true.

---

[3]    The Court notes that despite Plaintiff's counsel's certification, Plaintiff's Response in Opposition to Motion to Dismiss [16] is not in compliance with the formatting requirements of Local Rule 5.1C.

See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (construing Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Mere "labels and conclusions" are insufficient. Twombly, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). This requires more than the "mere possibility of misconduct." Am. Dental, 605 F.3d at 1290 (quoting Iqbal, 556 U.S. at 679). The well-pled allegations must "nudge[] their claims across the line from conceivable to plausible." Id. at 1289 (quoting Twombly, 550 U.S. at 570).

B.    Analysis

1.    Breach of the Nondisclosure Agreement's and the Purchase Agreement's Confidentiality Provisions

XPO seeks to dismiss Count Two of the Amended Complaint on the grounds it only disclosed the *fact* of the sale. XPO argues the Purchase Agreement was not violated because the terms of the Purchase Agreement were not disclosed. XPO

argues that the unambiguous terms of the Purchase Agreement only prohibit XPO from disclosing the actual agreement and its terms, not the mere *fact* that the Railcars were sold to Infinity.

The parties selected New York law to govern the Purchase Agreement. (Compl. Ex. 2 § 18).[4] "When interpreting a contract [under New York law], the 'intention of the parties should control, and the best evidence of intent is the contract itself.'" Gary Friedrich Enters., LLC v. Marvel Characters, Inc., 716 F.3d 302, 313 (2d Cir. 2013); see also Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985) ("As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties."). "At the outset, the court must determine whether the language the parties have chosen is ambiguous." Gary Friedrich Enters., 716 F.3d at 313 (quoting Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir.2011)); see also JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009); Alexander &

_____

[4]     Georgia allows parties to a contract to choose the governing law. See O.C.G.A. § 11-1-301(a). Infinity alleges that it is a citizen of New York, and that XPO has its principal place of business in Ohio. (Compl. ¶¶ 10-11). XPO and Infinity chose New York law to govern claims under the Purchase Agreement (id. Ex. 2, at § 18), and Ohio law to govern claims under the Nondisclosure Agreement (id. Ex. 1). The law of those two states applies to the respective contract claims. Georgia law applies to the remaining tort claims. See Dowis v. Mud Slingers, Inc., 621 S.E.2d 413, 415-16 (Ga. 2005).

Alexander Serv., Inc. v. These Certain Underwriters at Lloyd's, London, England, 136 F.3d 82, 86 (2d Cir. 1998) ("Under New York law the initial interpretation of a contract is a matter of law for the court to decide," including "the threshold question of whether the terms of the contract are ambiguous.") (internal quotation marks and citation omitted). Contractual terms are unambiguous if they have "a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." Greenfield v. Phillies Records, Inc., 780 N.E.2d 166 (N.Y. 2002) (quotation and citation omitted).

A contract is unambiguous if its "language has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A., 773 F.3d 110, 114 (2d Cir. 2014) (quoting Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (internal quotation marks omitted)). Conversely, a contract is ambiguous where "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008). "[T]he language of a contract is not made ambiguous simply because the parties urge different interpretations," nor "does ambiguity exist where one party's

view strains the contract language beyond its reasonable and ordinary meaning."

Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 598 (2d Cir. 2005)

(quoting Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992))

(internal quotation marks and alterations omitted).

"In interpreting an unambiguous contract, the court is to consider its

[p]articular words not in isolation but in the light of the obligation as a whole and

the intention of the parties as manifested thereby . . . but the court is not to consider

any extrinsic evidence as to the parties' intentions." Id. (citations and internal

quotation marks omitted); see also In re AMR Corp., 730 F.3d 88, 98 (2d Cir.

2013) ( "[C]ourts applying New York law construe a contract 'so as to give full

meaning and effect to all of its provisions.'") (quoting PaineWebber Inc. v. Bybyk,

81 F.3d 1193, 1199 (2d Cir. 1996)).  By contrast, if the contract is ambiguous,

"extrinsic evidence as to the parties' intent may properly be considered."

JA Apparel, 568 F.3d at 397.  "Where there is such extrinsic evidence, the meaning

of the ambiguous contract is a question of fact for the factfinder."  Id.

The Court first considers whether the Confidentiality Provision is

ambiguous.  The Court finds it is not.  The Confidentiality Provision of the

Purchase Agreement prohibits the parties from disclosing to most third parties "this

Agreement and the contents hereof, including without limitation, the purchase

price and other terms and conditions of this Agreement and the Transactions."

(Compl. Ex. 2, § 23). Infinity does not allege that XPO disclosed the "contents" of

the Purchase Agreement. Rather, the issue is whether the term "Agreement"

includes the fact of the sale. "Agreement" is capitalized in the Confidentiality

Provision and therefore afforded the definition provided in the contract, which is

"[t]his Purchase and Sale Agreement . . . made as of the 29th day of May, 2015."

(Compl. Ex. 2 at 1). This means that the parties were prohibited from disclosing

the specific written agreement itself, not the mere fact of the transfer of ownership

of the Railcars.[5]

Infinity argues that "this Agreement" and its "contents" must be given

different meanings because to find otherwise would violate principles of contract

interpretation requiring the Court to give effect to all the terms and avoid rendering

any language superfluous. E.g., U.S. Bank Nat. Ass'n v. Lightstone Holdings

---

[5]    XPO cites RST (2005) Inc. v. Research in Motion Ltd. to support its
argument. That case is distinguishable. In RST, the court evaluated contractual
language different from the Confidentiality Provision. The provision in RST
prohibited the parties from disclosing "any information or matters revealed to the
other pursuant to" or "any of the specific terms and conditions" of the agreement.
RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 368-69
(S.D.N.Y. 2009). The Purchase Agreement's Confidentiality Provision is
different. It prohibits disclosure of "this Agreement and the contents hereof,"
including the purchase price. (Compl. Ex. 2 § 23). Count Two is not dismissed on
this basis.

LLC, 103 A.D.3d 458, 459 (N.Y. App. Div. 2013) ("[C]ourts are obliged to interpret a contract so as to give meaning to all of its terms."). But this canon of interpretation is consistent with the Court's holding. "[T]his Agreement" does mean something different from its "contents": it refers to the written agreement of a certain date as defined in the Purchase Agreement. The Amended Complaint does not contain an allegation that XPO disclosed either the Purchase Agreement or its contents. Infinity fails to state a claim for breach of the Confidentiality Provision. Accordingly, Count Two is dismissed.

XPO seeks dismissal of the breach of the Nondisclosure Agreement claim on grounds similar to its argument in relation to the Purchase Agreement, arguing that the Nondisclosure Agreement does not prohibit disclosure of the mere fact of the sale of the Railcars. The Nondisclosure Agreement is governed by Ohio law. (Compl. Ex. 1). Under Ohio law, the construction of a contract is a question of law. Long Beach Assn., Inc. v. Jones, 697 N.E.2d 208, 209 (Ohio 1998). "First, a court must determine whether the disputed language is plain and unambiguous." Savoy Hospitality, LLC v. 5839 Monore St. Assocs., LLC, 2015 WL 7572088, at *5 (Ohio Ct. App. Nov. 13, 2015) (citing Beverly v. Parilla, 848 N.E.2d 881 (Ohio Ct. App. 2006)). "The language is unambiguous if, from reading only the four corners of the instrument, the language is clear, definite, and subject to only one

interpretation." Id. "Contract language is ambiguous 'if it is unclear, indefinite, and reasonably subject to dual interpretations." Id. "Undefined terms [in a contract] are to be given their 'plain and ordinary meaning.'" Navigators Specialty Ins. Co. v. Guild Assocs., Inc., No. 2:14-CV-1676, 2016 WL 6947933, at *5 (S.D. Ohio Nov. 28, 2016) (citing Ambrose v. State Farm Fire & Cas., 592 N.E.2d 868, 870 (Ohio Ct. App. 1990)). "In determining the plain meaning of a contractual term, the Court will read the contract as a whole and, to the extent possible, give each word its appropriate meaning." Id. (citing Hartzell Indus., Inc. v. Fed. Ins. Co., 168 F. Supp. 2d 789, 793 (S.D. Ohio 2001)). "Where terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." Savoy Hospitality, 2015 WL 7572008 at *5 (citation omitted).

The Court first considers whether the Nondisclosure Agreement is ambiguous. The Court finds it is not. Subparagraph (c) of the Nondisclosure Agreement prohibits disclosure of "the fact that discussions are taking place between the parties." (Compl. Ex. 1). The opening paragraph of the Nondisclosure Agreement states that it applies "in connection with our consideration of a possible commercial transaction or relationship" among the parties "including the potential sale of railcars." (Compl. Ex. 1). The other

subparagraphs of that same subsection of the Nondisclosure Agreement set forth

obligations related to "Evaluation Material" exchanged between the parties, which

could be used only for the "sole purpose of considering and evaluating a

commercial transaction or relationship." (Id. Ex. 1 ¶ (b)).

Subparagraph (c) expressly governs the parties' discussions prior to a

potential transaction for the purchase and sale of railcars. There is no language in

the Nondisclosure Agreement restricting disclosure of the actual sale after the sale

is consummated. Thus, the Nondisclosure Agreement only applies to confidential

discussions and information shared during the parties' consideration of a possible

transaction. There is no allegation in the Amended Complaint that XPO disclosed

such information. Infinity fails to state a claim for breach of the Nondisclosure

Agreement, and Count Four is dismissed.

### 2.    Breach of the Duty of Good Faith and Fair Dealing

XPO argues that Count Three and Count Five for breach of the duty of good

faith and fair dealing should be dismissed because they are duplicative of the

corresponding breach of contract claims. First, because the Amended Complaint

fails to state a claim for breach of the Nondisclosure Agreement, the corresponding

claim for breach of the implied covenant of good faith and fair dealing must fail.

"Courts in Ohio have therefore recognized that there is no independent cause of

action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract." Lucarell v. Nationwide Mut. Ins. Co., 2018-Ohio-15, at ¶ 43, 2018 WL 321683 (Ohio Jan. 4, 2018). Count Five is therefore dismissed.

As for Count Three—breach of the duty of good faith and fair dealing concerning the Purchase Agreement—XPO argues that it must be dismissed as duplicative of Count One for breach of the Purchase Agreement under New York law. "The duty of good faith and fair dealing is implicit in the performance of contractual obligations to the extent that a separately stated cause of action asserting breach of that duty is routinely dismissed as redundant." ERE LLP v. Spanierman Gallery, LLC, 942 N.Y.S.2d 472, 473 (N.Y. App. Div. 2012) (citing Banc of Am. Sec. LLC v. Solow Bldg. Co. II, L.L.C., 847 N.Y.S.2d 49 (N.Y. App. Div. 2007); see also RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 367 (S.D.N.Y. 2009) ("the weight of authority in this district strongly supports the dismissal of an implied covenant claim based on the same underlying facts as a breach of contract claim."); Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce, 894 N.Y.S.2d 47, 49-50 (N.Y. App. Div. 2010) ("The claim that defendants breached the implied covenant of good faith and fair dealing was properly dismissed as duplicative of the breach-of-contract claim, as both claims

arise from the same facts . . . and seek the identical damages for each alleged breach.").  Count Three of the Amended Complaint is based on the same allegations as Count Two.  (<u>See</u> Compl. ¶¶ 83-85 (alleging that XPO breached the duty of good faith and fair dealing in the Purchase Agreement by "disclosing the sale of the Railcars to Union Pacific"); <u>id.</u> ¶¶ 98-100 (alleging that XPO breached the duty of good faith and fair dealing in the Nondisclosure Agreement by "disclosing the sale of the Railcars to Union Pacific")).  For all these reasons, Count Three is dismissed for failure to state a claim.

3.    <u>Infinity's Fraud Claims in Count Six</u>

XPO argues that Infinity's claims for fraud, fraudulent inducement, and fraudulent concealment (Count Six), negligent misrepresentation (Count Seven), and violation of GUDTPA (Count Eight) are barred by the Purchase Agreement's merger provision because they are based on representations made prior to the execution of the Purchase Agreement.

When a party affirms a contract containing a proper merger provision, fraud based claims based on pre-contract representations are precluded.  The Georgia Supreme Court has stated that "where the allegedly defrauded party affirms a contract which contains a merger or disclaimer provision and retains the benefits, he is estopped from asserting that he relied upon the other party's

misrepresentation and his action for fraud must fail." Ekeledo v. Amporful, 642

S.E.2d 20, 22 (Ga. 2007) (citing Authentic Architectural Millworks, Inc. v. SCM

Grp. USA, Inc., 586 S.E.2d 726, 729 (Ga. Ct. App. 2003).[6]  In Ekeledo, the court

indicated that this principle bars not only fraud claims based upon the alleged, pre-

contract misrepresentations, but all tort claims based upon such misrepresentations.

Id. at 22.

> The Purchase Agreement contains the following merger provision:
>
> This Agreement, the Schedules and Exhibits hereto, contains the
> entire agreement and understanding among the parties hereto with
> respect to the subject matter contained herein and supersedes all prior
> agreements, understanding and representations, oral or written,
> between the parties concerning the subject matter hereof, except the
> parties' Confidentiality Agreement dated April 13, 2015.

(Compl. Ex. 2, at § 20).  Infinity argues that XPO's alleged misrepresentations

were "carried forward in the [Purchase Agreement] itself" and therefore the merger

clause "cannot obviate misrepresentations in that very contract."  In Georgia, a

valid merger clause will not bar claims based on misrepresentations made in the

contract itself.  Chhina Family Partnership, L.P. v. S-K Grp. of Motels, Inc., 622

S.E.2d 40, 43 (Ga. Ct. App. 2005); WirelessMD, Inc. v. Healthcare.com Corp., 610

---

[6]      It is undisputed that, in this case, Infinity chose not to pursue any claim for
rescission and chose, instead, to affirm the contract and sue for damages.

S.E.2d 352, 359 (Ga. Ct. App. 2005); Authentic Architectural Millworks, Inc. v. SCM Grp. USA, Inc., 586 S.E.2d 726, 729 (Ga. Ct. App. 2003). But here, Infinity's fraud claims are based on the alleged misrepresentation made to Paul Goss that predate the Purchase Agreement. As such, Infinity is now estopped from bringing fraud claims based on those alleged misrepresentations. That Infinity's fraud claims are purportedly based on "*both* XPO's false representations to Paul Goss *and* its statements of fact in the [Purchase Agreement]" (Compl. ¶ 105) does not save those claims from dismissal. The latter basis for fraud refers to XPO's representations regarding its relationships with railroads in Section 5.1 of the Purchase Agreement, which is properly brought as a breach of contract claim in Count One of the Amended Complaint. Accordingly, Count Six is dismissed.[7]

Infinity's claim for negligent misrepresentation (Count Seven) must also be

---

[7]    Infinity is similarly not able to overcome the merger provision by framing its claim as one for fraudulent concealment. The Amended Complaint alleges that when Infinity asked Phil Harrison about "quid pro quo" agreements between XPO and any railroad, Harrison responded that he was unaware of any such agreements. (Compl. ¶¶ 34-36; [16] at 13 "Infinity made a direct inquiry as to XPO's arrangements with the railroads. XPO misrepresented the truth in response"). However, these allegations constitute a purported misrepresentation, not a concealment. See Lakeside Invests. Grp., Inc. v. Allen, 559 S.E.2d 491, 493-94 (Ga. Ct. App. 2002) (rejecting plaintiff's assertion that its claim was for fraudulent concealment where it was based on a direct statement). The Court need not reach XPO's argument that fraudulent concealment is limited to the real estate context.

dismissed as improper attempts to repackage its breach of contract claim into various torts. "The general rule in Georgia is that a breach of contract cannot constitute a tort unless a special or confidential relationship exists between the parties. . . . the defendant may not convert its breach of contract claim against the plaintiff into a tort for alleged negligent misrepresentation." Cives Corp. v. Se. Investments, LLC (LA), No. 1:12-CV-2279-RLV, 2014 WL 11822760, at *5 (N.D. Ga. Apr. 14, 2014); see also Kin Chun Chung v. JPMorgan Chase Bank, N.A., 975 F. Supp. 2d 1333, 1344-45 (N.D. Ga. 2013) ("A plaintiff in a breach of contract case has a tort claim only where, in addition to breaching the contract, the defendant also breaches an independent duty imposed by law.").

### 4. GUDTPA and Irreparable Harm

XPO argues that Count Eight, for violation of GUDTPA, fails to state a claim because Infinity does not allege irreparable harm in the absence of an injunction, which is the only relief available under the statute. Infinity argues that it is not required to plead irreparable harm, but if it is, it has alleged "the type of ongoing harm that would qualify as 'irreparable.'"

The only remedy available under the GUDTRA is injunctive relief. See Tri-State Consumer Ins. Co., Inc. v. LexisNexis Risk Solutions, Inc., 823 F. Supp. 2d 1306, 1327 (N.D. Ga. 2011); see also Moore–Davis Motors, Inc. v. Joyner, 556

S.E.2d 137, 140 (Ga. Ct. App. 2001) ("[T]he sole remedy available under the [G]UDTPA is injunctive relief."). The GUDTPA authorizes injunctive relief for a person "likely to be damaged by a deceptive trade practice . . . under the principles of equity" O.C.G.A. § 10-1-373(a). "[W]ell established principles of equity" require a plaintiff seeking injunctive relief to demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). These "familiar principles" apply to the GUDTPA, and "a major departure from the long tradition of equity practice should not be lightly implied." Id. at 391 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 320 (1982)).

The Amended Complaint does not allege irreparable harm. Infinity's GUDTPA claim specifically alleges only monetary harm. (Compl. ¶ 133 ("Infinity has and continues to suffer damages"), ¶ 134 (alleging that XPO's conduct has "materially diminish[ed]" the value of the railcars and that "Infinity has lost profits" and "incurred significant costs to store the rejected Railcars")). Because a remedy at law is available, Infinity cannot allege irreparable harm. See B.S.T. AG

Solutions, Inc. v. PWB AG Consulting, LLC, No. 1:15-CV-88 (LJA), 2015 WL 4067569, at *7 (M.D. Ga. July 2, 2015) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.") (quoting NE Fla. Chapter of Ass'n of Gen. Contractors of Am. v. Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990)).  Accordingly, Count Eight of the Amended Complaint is dismissed.

## III.    CONCLUSION

For the foregoing reasons, Defendant's Partial Motion to Dismiss Plaintiff's First Amended Complaint [13] is **GRANTED.**

**IT IS FURTHER ORDERED** that Counts Two, Three, Four, Five, Six, Seven, and Eight of the Amended Complaint are **DISMISSED**.


**SO ORDERED** this 18th day of January, 2018.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE